UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LUIS CUAHAUTHEMOC GRANADOS, JR.,

                           Plaintiff,

      v.                                  Case No. 15-cv-1106-pp

RYAN RASMUSSEN, JESSE UMENTUM,
PETER SCHALK, CORY SABISH, and
BONNIE HALPER,

                           Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26),
DISMISSING DEFENDANTS JESSE UMENTUM, PETER SCHALK,
CORY SABISH, AND BONNIE HALPER, AND RECRUITING
*PRO BONO* COUNSEL FOR THE PLAINTIFF**

The plaintiff, currently in prison in Wisconsin and representing himself,
is proceeding on Eighth Amendment claims regarding the defendants' failure to
protect the plaintiff from harming himself.

**I.     FACTS[1]**

    A.     <u>Parties</u>

At the time of the events he describes in the complaint, he was an inmate
at Waupun Correctional Institution (Waupun) in 2015. Dkt. No. 29 at ¶1. (He

---

[1] The facts are taken from the "Defendants' Proposed Findings of Fact," dkt.
no. 29, the plaintiff's affidavit, dkt. no. 40, filed in response to the defendants'
motion for summary judgment, and the plaintiff's sworn complaint, dkt. no. 1,
which the court construes as an affidavit at summary judgment. <u>Ford v.
Wilson</u>, 90 F.3d 245, 246-47 (7th Cir. 1996). Where the plaintiff fails to cite
evidentiary material to object to the defendant's proposed facts, those facts are
deemed admitted for the purpose of deciding summary judgment. <u>See</u> Civ. L. R.
56(b)(2)(B)(i) and (b)(4).

recently was transferred to Green Bay Correctional Institution. Dkt. No. 42.) Defendants Ryan Rasmussen, Jesse Umentum, Peter Schalk, and Cory Sabish were members of the security staff at Waupun, and defendant Bonnie Halper was a psychological associate at Waupun. Dkt. No. 29 at ¶¶5-7, 19.

B.    Previous Self-Harm Injury

On February 10, 2015, a nurse was called to the restrictive housing unit at Waupun because the plaintiff had cut himself with a razor, then "flushed the razor." Dkt. No. 29 at ¶31. He had a two-inch laceration on his left upper arm. Id. "The nurse applied two butterfly closures and two 4x4s with tape to cover the laceration." Id.

A little over a month later, on March 10, 2015, a nurse again was called to the restrictive housing unit, this time to check the plaintiff's left arm. Id. at ¶32. The plaintiff had picked "the scab off his healing laceration and dried blood surrounded the area." Id. It looked to the nurse as though the plaintiff "was trying to make the wound bigger." Id. The nurse instructed the plaintiff to keep his hands off his wound and to keep it clean and dry. Id.

C.    Transfer to Observation

A few days later, on March 13, 2015 at approximately 1:45 p.m., the plaintiff reported to staff members that he was suicidal. Id. at ¶33. He made numerous statements that he would harm himself and needed to be placed in observation. Id. The plaintiff "said he had been trying to work with staff concerning his restrictions, but he felt he had not been treated fairly, and this made him want to hurt himself." Id. The plaintiff asked to be "strapped down,"

2

and threatened to "open his arm up" when placed in observation. Id. Due to the plaintiff's statements about his intention to hurt himself and his overall agitated presentation, Psychological Associate Joshua Olson decided to place the plaintiff in observation, with close fifteen-minute checks as a preventative measure. Id. The defendants indicate that the plaintiff "had been having difficulty with stability," based on the fact that this was his third observation placement since March 7, 2015. Id.

The plaintiff says that he was escorted to the "strip cage" before he was taken to an observation cell, but he does not specify who escorted him. Dkt. No. 1 at 3. According to the plaintiff, defendant Rasmussen approached him and ordered him to hand out his "green gown for exchange for a paper gown." Id. The plaintiff says that Rasmussen "seemed drunk." Dkt. No. 40 at 1. The plaintiff asked Rasmussen if he was being strip searched, and Rasmussen said no. Dkt. No. 1 at 3. In his complaint, the plaintiff quoted Rasmussen as saying, "No, I'm not feeling it today, just give me your gown and put this on ...." Id. In his affidavit in response to the defendants' motion for summary judgment, the plaintiff relays Rasmussen's words as, "no I'm not feeling it today, just get dressed." Dkt. No. 40 at 1.

In his complaint, the plaintiff states that Rasmussen, Umentum, Sabish, and Schalk escorted him to "the cell" and placed him in observation. Dkt. No. 1 at 3. In his affidavit, the plaintiff says that Rasmussen and Umentum escorted him to his observation cell and, when they arrived, Schalk and Sabish were

searching the cell. Dkt. No. 40 at 1. According to the plaintiff, "they didn't make sure I didn't have any item on me or ask if I was in the strip search." Id.

D.    Plaintiff's Self-Harm on March 13, 2015

Moments after he was placed in the observation cell, the plaintiff noticed that he still had his rosary around his neck and half a comb in his hair. Dkt. No. 1 at 3-4. The plaintiff "instantly used both items to cut [his] inner left elbow." Id. at 4.

Around 3:00 p.m. that day, Halper was "conducting other contacts in the restrictive housing unit." Dkt. No. 29 at ¶34. The plaintiff called out to her and asked to talk, and Halper approached his door. Id. The plaintiff showed Halper what she thought was a plastic rosary. Id. He also showed Halper his wrist, and "demonstrated that he used the charm to engage in self-harm." Id. Halper described the wound on the plaintiff's wrist "as a scratch or superficial abrasion." Id.

Halper told the plaintiff "that he would need to hand out the rosary." Id. Halper does not have keys to the observation cells, and doesn't carry a radio to contact the sergeant or other security staff. Id. "Halper went quickly to report the incident to the sergeant." Id. By the time the sergeant arrived, the plaintiff said he had swallowed the rosary and had flushed the beads and comb. Id.; Dkt. No. 40 at 2.

"A supervisor was called," and the plaintiff "was placed in ambulatory restraints for his own protection. Dkt. No. 29 at ¶34. The plaintiff says that he "was put in the strip cage where they took pictures." Dkt. No. 40 at 2. He also

4

indicates that the doctor "put [him] in mitts and the body suit." Id. (A "Safety Suit" covers the body from ankles to neck; it keeps the person from "being able to pass items through his body and retrieve them," as well as preventing the person from irritating a wound or harming himself. Dkt. No. 29 at ¶21.)

The restrictive housing unit logbook entry for second shift on March 13, 2015 indicates that the plaintiff swallowed something and cut his arm at approximately 2:56 p.m. Dkt. No. 29 at ¶21. The health services unit saw him, and put him in "mitts," or the "Tube." Id. at ¶¶21. (The Tube restraint covers one's entire hand, to keep the person from grasping items, and from irritating or opening wounds. Id.) The plaintiff was continued on observation status as a preventative measure. Id. at ¶34. The plaintiff avers that he sustained severe scar tissue from cutting himself and has emotional thoughts when he looks at the scar. Dkt. No. 1 at 4.

Over the next several days, the plaintiff was placed in the Tube and the Safety Suit. Dkt. No. 29 at ¶21. While in the safety suit, the inmate does not have the ability to use the toilet without a staff member assisting him and removing the suit. Id. at ¶22. An inmate cannot use the toilet in his cell if he's in the Safety Suit. Id.

During this time, the plaintiff had two sets of x-rays to check his abdomen for foreign objects. Id. at ¶¶40, 48. The first x-ray (March 17, 2015) was unclear, id. at ¶41, but the second x-ray (March 23, 2015) revealed no obstruction. Id. at ¶48. Psychological Associate Paul Ludvigson released the plaintiff from observation on March 23, 2015, "based on his x-ray being

5

deemed clear of any foreign body object by Health Services, as well as [the plaintiff's] denial of current thoughts of self-harm." Id. at ¶49. The plaintiff had told Ludvigson that he could not remember what he used to cut himself and then swallowed, but he said he passed it and flushed it before staff was monitoring his toilet. Id. at ¶45.

  E. <u>Observation</u>

  The Division of Adult Institutions (DAI) "has measures in place to help decrease the risk of self-harm behaviors and suicides within adult facilities." Dkt. No. 29 at ¶12. "These measures include staff training, early identification of at-risk inmates, prompt intervention, effective treatment in accordance with professional judgment and standards, and collaboration among staff." Id. The DAI gives those staff members who have contact with inmates training in suicide prevention and mental health issues on a regular basis. Id. at ¶13. The DAI "also provides security training to mental health staff." Id.

  "Clinical observation is a non-punitive status used for temporary confinement of an inmate to ensure the safety of the inmate or the safety of others." Id. at ¶14. "Authorized staff place inmates who are at risk of harming themselves, or who are mentally ill and at risk of harming themselves or others, on clinical observation status as necessary to ensure the safety of the inmate and others." Id. at ¶15.

  "Inmates in observation status are checked on by unit staff every 15 minutes throughout the day and night." Id. at ¶53. "Psychological staff conduct daily rounds of inmates on observation status." Id. "An inmate's placement in

6

observation status is also reviewed daily by a psychologist during the weekdays to either continue his placement or remove him from observation status." Id. The psychological staff member "evaluates the inmate's behavior and mental health condition to determine whether there is a risk to the inmate's safety or the safety of others, and the inmate's property can also be reviewed during these contacts to determine if property should be added or removed." Id.

"Any staff who discovers an inmate attempting self-harm or suicide will notify security staff or other staff available nearby." Id. at ¶16. Security staff survey the scene, secure the area, and alert other staff to call for medical personnel, security back-up, and a Security Supervisor." Id. "Trained staff follow applicable security procedures to stabilize the inmate and the scene and begin first aid when safe to do so." Id. at ¶17. "Mechanical restraints are available to immobilize inmates who exhibit behavior that is dangerous to self, others, or property on the basis of mental illness when less restrictive means are not available or effective." Id. at ¶18.

F.    Strip Searches

Under Wisconsin Administrative Code § DOC 306.17(2), a "strip search" is "a search in which the person is required to remove all clothes." Dkt. No. 29 at ¶9. Strip searches are conducted in "a clean and private place," and include "examination of the inmate's clothing and body and visual inspection of body cavities." Id. "Any staff member may conduct a visual inspection of body cavities." Id. A strip search is conducted by two staff members, one of whom "must be the same sex as the inmate unless an emergency situation exists." Id.

7

Staff members may conduct strip searches: (1) "[b]efore an inmate enters or leaves the security enclosures of a maximum or medium secure institution or the grounds of a minimum-security institution"; (2) "[b]efore an inmate enters or leaves a segregation unit or changes status within a segregation unit"; (3) "[b]efore or after visits, or during a visit[]"; (4) "[a]s part of a periodic search and lockdown of all or part of the institution's premises"; or (5) "[a]t the direction of a supervisor." Dkt. No. 29 at ¶10. "Before a search is conducted, staff members inform the inmate that a search is about to occur, the nature of the search, and the place where the search is to occur." Id. at ¶11.

"Correctional officers are trained to perform strip searches and staff-assisted strip searches properly." Dkt. No. 29 at ¶8. Correctional officers receive approximately seven weeks of training at the Corrections Training Center in Madison, Wisconsin before they are appointed to a position as a correctional officer. Id. Correctional officers also receive on-the-job training at the institution where they are assigned. Id. Officers and sergeants assigned to the segregation unit at Waupun train new officers assigned to segregation on duties that are specific to that area of the prison. Id. Staff members are aware of the necessity of performing accurate strip searches, and "they follow the appropriate procedure very carefully." Id. Seasoned staff members demonstrate to new staff members "what needs to occur" before the new staff members perform staff-assisted strip searches. Id. Every year, correctional officers continue their training and education, including "some regular annual training that includes refresher training in other areas." Id. In 2014, "each officer

8

received refresher training on the performance of strip searches and staff-assisted strip searches." Id.

Umentum and Schalk "do not recall having any involvement in the strip search or escort of [the plaintiff] to observation status on March 13, 2015." Dkt. No. 29 at ¶24. Nevertheless, they state that if they were "escorting an inmate to and/or from the cell to be placed in observation a strip search would have been performed." Id. Umentum and Schalk worked in the restrictive housing unit almost daily, and they are "not aware of any incidents in which staff purposely placed an inmate who was threatening self-harm into an observation cell with property with which he could hurt himself." Id. at ¶28. If Umentum or Schalk "had knowledge that a staff member at Waupun . . . purposely placed an inmate who was threatening self-harm into an observation cell with property with which he could hurt himself, they would take action to make sure that any necessary corrective measures were taken to prevent an incident of self-harm from occurring." Id. at ¶29.

Schalk avers that if he was "conducting a strip-search of an inmate before escorting him to an observation cell, and he observed that the inmate was wearing/holding a rosary or a piece of comb, these items would have been confiscated before escorting the inmate to the observation cell." Id. at ¶25. A strip search "has been conducted" every time Umentum and Schalk have participated in an observation escort. Id. at ¶26. Neither Umentum nor Schalk ever has participated in an observation escort without a strip search. Id.

"[E]ven a good strip search might not reveal a concealed weapon or a harmful item in an inmate's possession." Id. at ¶27. "In addition, inmates sometimes find items to inflict self-harm in the observation cell, even after the observation cell is searched by staff before the inmate is placed in it." Id.

In Halper's professional experience, "if an inmate truly wishes to self-harm, he will find a way to accomplish that." Id. at ¶52. "Even without any property items, an inmate could use his hands/fists, teeth, fingernails, or even the walls of the observation cell as a means to harm himself." Id. "It is impossible to predict all the ways an inmate could engage in self-harm in any given circumstance." Id.

## II. DISCUSSION

In its screening order, the court allowed the plaintiff to proceed on an Eighth Amendment claim that Rasmussen, Umentum, Schalk, Sabish and Halper did not protect the plaintiff from hurting himself. Dkt. No. 9 at 5. The court also allowed the plaintiff to proceed on a claim that these defendants were deliberately indifferent to his serious medical need—his thoughts of harming himself. Id. at 6.

The defendants argue that they are entitled to summary judgment on the plaintiff's claims. They maintain that the plaintiff did not suffer an objectively serious harm that presented a substantial risk to his safety, dkt. no. 27 at 7; that the plaintiff has not alleged sufficient personal involvement by defendants Umentum, Sabish, and Schalk, id. at 9; and that none of the defendants were

deliberately indifferent, id. at 11-14. The defendants also submit that they are entitled to qualified immunity. Id. at 14.

A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must designate specific facts that establish that there is a genuine triable fact. Fed. R. Civ. P. 56(e). The court grants summary judgment when no reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B. Failure to Protect from Self-Harm

The Eighth Amendment imposes a duty on prison officials not only to provide "humane conditions of confinement," but to insure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. Farmer v. Brennan, 511 U.S. 825, 834-35 (1994). An inmate may prevail on a claim under the Eighth Amendment by showing that the defendant acted with "deliberate indifference" to a "substantial risk of serious harm" to the plaintiff's health or safety. Id. at 836. Attempted suicide and other forms of significant self-harm constitute such harm. See Minix v. Canarecci, 597 F.3d 824, 831

11

(7th Cir. 2010). Deliberate indifference to a risk of self-harm is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet "fail[s] to take reasonable steps to prevent the inmate from performing the act." <u>Pittman ex rel. Hamilton v. County of Madison, Ill.</u>, 746 F.3d 766, 775-76 (7th Cir. 2014) (citations omitted). <u>See also Rice ex rel. Rice v. Correctional Medical Services</u>, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

C.    <u>Objectively Serious Harm</u>

The defendants' first argument is that the plaintiff did not suffer an objectively serious harm that presented a substantial risk to his safety. Dkt. No. 27 at 7-8. They maintain that the plaintiff showed Halper a superficial scratch on his wrist and claimed he swallowed a plastic cross, which was never verified. They also submit that there is no medical record of any injury related to March 13, 2015, and that the wound on the plaintiff's arm was from when he cut himself with a razor on February 10, 2015. In contrast, the plaintiff maintains that he cut his left elbow on March 13, 2015, and has a severe scar and has suffered emotional harm as a result.

Setting aside for the moment the factual dispute regarding the injury sustained on March 13, 2015, the question is not whether the plaintiff suffered an objectively serious harm but whether there was a *substantial risk* of serious harm. The plaintiff had threatened self-harm, and the psychological associate considered those threats credible enough to transfer the plaintiff to an

12

observation cell. As the court stated above, attempted suicide and other forms of significant self-injury constitute serious harm. See Minix, 597 F.3d at 831. There was a substantial risk that the plaintiff would try to injure or kill himself on March 13, 2015; that was the objectively serious harm that day.

D.    Personal Involvement

The defendants' second argument is that the plaintiff fails to explain how defendants Umentum, Sabish and Schalk have the required level of personal involvement for a §1983 failure to protect claim. Dkt. No. 27 at 9.

Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003). With regard to supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

From the plaintiff's description of events, it appears that Rasmussen was responsible for conducting any search of the plaintiff before his transfer to observation. It was Rasmussen who the plaintiff says decided not to conduct a strip search on March 13, 2015, which, the plaintiff claims, resulted in the plaintiff having a plastic rosary and half a comb in his observation cell.

13

Although the plaintiff submits that defendants Umentum, Sabish and Schalk participated in escorting the plaintiff to the observation cell, and/or searched the observation cell before the plaintiff entered it, they were not responsible for double-checking Rasmussen's work on the strip search. "Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." Burks, 555 F.3d at 595. "The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under §1983 for not being ombudsmen." Id. The court will grant the defendants' motion for summary judgment as to defendants Umentum, Sabish and Schalk.

E.    Halper was not deliberately indifferent

Next, the defendants submit that Halper was not deliberately indifferent to the plaintiff's serious medical need. Dkt. No. 27 at 10-11. It is undisputed that Halper went to the plaintiff's cell door when he called for her, and that she went quickly to report the plaintiff's injury as soon as the plaintiff showed her his wrist. Dkt. No. 29 at ¶34. She did not have keys to the observation cells, and she did not carry a radio, so she had to go and find someone to help. Id. The plaintiff has failed to present sufficient facts that, even when viewed in the light most favorable to him, could plausibly show that Halper failed to take reasonable steps to stop the plaintiff's self-harm and to help him. See Estate of

14

Miller v. Tobiasz, 680 F.3d 984, 993-94 (7th Cir. 2012) (quoting Riccardo v. Rausch, 375 F.3d 521, 525 (7th Cir. 2004)) ("[a]ll that can be expected is that guards act responsibly under the circumstances that confront them," and "minor delays [may be] eminently reasonable and necessary to ensure . . . safety"). The court will grant the defendants' motion for summary judgment as to Halper.

F.    Rasmussen

The court now turns to the defendants' argument that Rasmussen was not deliberately indifferent to the risk of harm to the plaintiff. Dkt. No. 27 at 11. The defendants assert that even if the plaintiff was wearing the rosary and Rasmussen failed to see it during the search, his failure was at most negligence, not deliberate indifference. Id. The defendants did not submit a declaration from Rasmussen, so the court must take the facts regarding the search entirely from the plaintiff's accounts. According to the plaintiff, Rasmussen conducted no search at all. Dkt. No. 40 at 1; Dkt. No. 1 at 3. Missing an item in a reasonable search could constitute negligence, but not conducting a search at all is a different matter. A reasonable jury could conclude that Rasmussen's failure to conduct a search of an inmate before taking him to an observation cell after he had made threats of self-harm constitutes deliberate indifference.

G.    Qualified Immunity

Finally, the court will consider whether Rasmussen is entitled to qualified immunity.

15

> "The doctrine of qualified immunity protects government officials
> from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of
> which a reasonable person would have known." Pearson v.
> Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565
> (2009) (internal quotation marks omitted). Accordingly, in order to
> defeat a properly raised qualified immunity defense, the plaintiff
> must establish two things: "first, that the facts alleged describe a
> violation of a protected right; and second, that this right was
> clearly established at the time of the defendant's alleged
> misconduct." Mordi v. Zeigler, 770 F.3d 1161, 1164 (7 Cir. 2014).
> [The court has] the discretion to decide which of these two prongs
> to address first. See Pearson, 555 U.S. at 236, 129 S.Ct. 808.

Gerhartz v. Richert, 779 F.3d 682, 688 (7th Cir. 2015).

The defendants argue generally that the plaintiff cannot show that it was beyond debate that defendants would violate the plaintiff's constitutional rights because (1) the plaintiff did not suffer an objectively serious harm that presented a substantial risk to his safety, and (2) the defendants either were not personally involved or were not deliberately indifferent.

An official who is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet "fail[s] to take reasonable steps to prevent the inmate from performing the act," is deliberately indifferent to a risk of self-harm. Pittman, 746 F.3d at 775-76. A reasonable step to prevent an inmate from harming himself could be searching an inmate for items he could use to harm himself before taking him to an observation cell. Yet the undisputed fact before the court is that Rasmussen failed to conduct any search of the plaintiff for items that he could use to harm himself before taking the plaintiff to an observation cell—and the reason for taking the plaintiff to the observation cell was because the plaintiff made threats of self-harm (a seriously

objective harm). There is a question, then—one for the jury—about whether Rasmussen's conduct violated the plaintiff's clearly-established Eighth Amendment rights. In light of that question, the court concludes that Rasmussen is not entitled to qualified immunity. The court will deny the defendants' motion for summary judgment as to the plaintiff's claim against Rasmussen.

### III.  COUNSEL

The plaintiff previously filed four motions asking the court to appoint counsel to represent him. Dkt. Nos. 8, 16, 24, 36. The court denied each motion without prejudice. Dkt. Nos. 9, 17, 37. At this stage in the case, the court believes the assistance of *pro bono* counsel would be beneficial. The court will recruit *pro bono* counsel to represent the plaintiff on his remaining claim against Rasmussen. Once the court recruits *pro bono* counsel, and the plaintiff signs an Agreement to Reimburse the Pro Bono Fund, the court will schedule a telephone status conference with the attorneys.

### IV.  CONCLUSION

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 26. The court **GRANTS** summary judgment as to defendants Jesse Umentum, Peter Schalk, Cory Sabish and Bonnie Halper, and **DISMISSES** those defendants. The court **DENIES** the defendants' motion for summary judgment as to the plaintiff's claim against defendant Rasmussen.

17

The court will recruit *pro bono* counsel for the plaintiff and then schedule a telephone status conference with the attorneys.

Dated in Milwaukee, Wisconsin this 8th day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge